[No. 1974.]

## HARDWICK v. McCLURG ET AL.

1. MINES AND MINING—CONTRACTS—OPTIONS.

Plaintiff and one K. entered into an agreement whereby plaintiff in consideration of $1.00 in cash, a certain sum to be paid in ten days and a payment every ninety days thereafter until the entire purchase price should be paid, agreed to sell to K. certain mining stock, a lease on a mining claim and an interest in a tunnel site. Upon the payment of the amount due in ten days, plaintiff was to assign and deliver to K. the lease, and the mining stock and a deed to the tunnel site were to be placed in escrow, and as each subsequent payment was made, a proportional part of the stock was to be delivered, and when the entire amount was paid, the deed to the tunnel site was to be delivered. It was stipulated that the contract was an option to purchase all of the property at the price named, and in default of said payments being made, the mining stock and deed were to be returned to plaintiff. K. assigned the contract to defendant who made the payment stipulated to be made in ten days, and the lease was assigned and delivered to defendant, but no further payments were made on the contract. *Held*, that the contract was an option to defendant to purchase all the property, but as each payment should be made and certain property should be delivered to defendant, as to such property it would become a completed sale and the option would continue as to the balance. That the assignment and delivery of the lease was a complete transfer, and plaintiff could not compel its reassignment upon defendant's default.

2. EVIDENCE—WRITTEN INSTRUMENTS—PAROL AGREEMENTS.

The terms of a written instrument cannot be contradicted by parol understandings or agreements. Where the terms employed are vague or ambiguous, attendant circumstances, and the acts and declarations of the parties at the time may be considered, to find what meaning the parties intended to convey by the language used, but not to add to or detract from the contract.

*Appeal from the District Court of El Paso County.*

Messrs. GUNNELL, CHINN & MILLER and Messrs. BLACKMER & McALLISTER, for appellant.

Mr. TYSON S. DINES, for appellees.

THOMSON, J.

On the 11th day of September, 1897, The Montreal Gold Mining and Milling Company, by its written contract of that date, leased the Fluorine mining claim to W. J. Scott for the term of fifteen months, upon the conditions specified in the contract. On the 11th day of November, 1897, Scott, by assignment in writing, indorsed upon the contract, transferred to J. O. Hardwick all his right, title and interest in and to the lease. On the 29th day of November, 1897, J. O. Hardwick and Mr. Kinney subscribed the following instrument in writing : " This agreement, made and entered into by and between J. O. Hardwick of the first part, and M. Kinney of the second part, Witnesseth : That the party of the first part hereby agrees to sell and deliver to the party of the second part five hundred and one thousand shares of the stock of The Montreal Gold Mining and Milling Company, and also a lease on the Fluorine lode mining claim executed by said company to W. J. Scott and by him assigned to said J. O. Hardwick, and also an undivided one half interest in and to the Minneapolis tunnel site on Copper mountain, in the Cripple Creek mining district, upon the conditions following : Provided the said Kinney shall pay to the said Hardwick the sum of forty thousand dollars ($40,000) in the manner following : One dollar cash in hand, the receipt of which is hereby acknowledged, nine hundred and ninety-nine dollars ($999) in ten days from this date, four thousand dollars ($4,000) in ninety days thereafter, and five thousand dollars ($5,000) in each and every ninety days thereafter until the whole amount of said forty thousand dollars shall have been paid.

" It is further understood and agreed that said lease shall be duly assigned by said Hardwick and turned over to said Kinney on the payment of said nine hundred and ninety-nine dollars, when said amount shall be paid. All of said stock shall be deposited in the Bi-Metallic Bank of Cripple Creek when said nine hundred and ninety-nine dollars shall be paid,

and to be thereafter delivered to said Kinney, or his assigns in the manner following: On each payment being made, as hereinbefore provided, a proportionate amount of said stock, being an amount which shall have been paid for by said payment according to the entire purchase price of said stock, and as each payment shall be made, and a deed to the undivided one-half interest in the Minneapolis tunnel site, as aforesaid, shall be delivered in escrow with said stock in the said the Bi-Metallic Bank and shall be delivered to said Kinney, or his assigns on final payment as herein provided. It is further understood and agreed that when the third payment of four thousand dollars shall have been made, the said Hardwick shall assign to the said Kinney, or his order, an account now held by said Hardwick against The Copper Mountain Gold Mining Company for twelve hundred and fifty dollars ($1,250).

" It is further understood and agreed that this contract constitutes, and is an option given by said Hardwick to said Kinney to purchase all of the property at the price named, as hereinbefore mentioned and described, and that the terms of payment and the delivery shall be embraced in an escrow agreement endorsed upon the envelope containing said stock and deed as instructions to said Bi-Metallic Bank for the delivery of said stock and deed as payments shall be made as herein provided; and in default of said payments being made as herein provided, said stock and deed shall be redelivered to the said Hardwick.

" In witness whereof the parties hereto have hereunto set their hands this 29th day of November, A. D., 1897.

" J. O. HARDWICK.
" M. KINNEY."

On December 6, 1897, the following assignment was indorsed on the foregoing instrument:

" For and in consideration of one dollar, the receipt of which is hereby acknowledged and confessed, I hereby sell, assign and set over to James A. McClurg and his assigns, all my

right, title and interest in and to the above mining option and agreement.

"M. KINNEY."

On the 7th day of December, 1897, the following instrument of transfer was written upon the lease:

"For and in consideration of $999, and other consideration not herein mentioned, the receipt of the above mentioned cash in hand to me paid, the receipt of which is hereby acknowledged, I hereby set over all my right, title and interest in and to the within lease. Dated this 7th day of December, 1897, at Cripple Creek, Colorado. To James A. McClurg of the city of Denver.

"J. O. HARDWICK."

This action was brought by Hardwick on the 22d day of March, 1898. The complaint alleged the execution of the contract between the plaintiff and Kinney, and, in addition, that the plaintiff assigned the lease to Kinney for the purpose of working and developing the property until the second payment mentioned in the instrument they had subscribed should become due; and that it was understood and agreed between them that if such payment should not be made, or if there should be default in the other payments, the lease should be reassigned by Kinney to the plaintiff. It was also averred that there was an understanding and agreement between Kinney and the plaintiff that the assignment of the lease was not a sale of the lease, but only an option; that the payment of the $999 was only the first payment of the entire consideration; and that the agreement that unless the whole consideration should be paid, the lease should be retransferred, was known to the defendant McClurg. The complaint further alleged that the defendant took possession of the leased premises, and shipped and sold therefrom ore to the value of $20,000; and that none of the payments subsequent to that of $999 was ever made. The plaintiff prayed a decree for the reassignment to him of the lease, and for an accounting.

The answer denied any knowledge on the part of the defendant of any agreement between Kinney and the plaintiff not embraced in the instrument subscribed by them ; and denied that the plaintiff assigned the lease to Kinney, but averred that upon payment by him, the defendant, to the plaintiff, of $999, the latter assigned the lease to him. The plaintiff has brought the case to this court by appeal from the judgment against him in the court below.

The allegation in the complaint that the plaintiff assigned the lease to Kinney was disproved by the evidence. As we have already seen, the assignment was made directly to Mc-Clurg ; so that the averments concerning the purpose with which the lease was assigned to Kinney, and the understanding between the plaintiff and Kinney at the time as to the retransfer of the lease, would be immaterial. But no point is made upon this discrepancy in the argument, and we shall adopt the method which counsel have followed in their treatment of the case.

One theory of counsel for the plaintiff is that the evidence offered would prove an agreement or understanding between Kinney and the plaintiff, not embraced in the instrument they subscribed, but known to the defendant, by reason of which the assignment of the lease to the defendant was tentative merely, and was to operate as an actual transfer only in case all the other payments mentioned in that instrument were duly made ; that such evidence was competent, relevant and material ; and that the rights of the parties to this action are controlled by the alleged understanding or agreement. Also, arguing from the language of the instrument, counsel say that it contemplated a sale of the lease, stock, and interest in the tunnel site, as a whole, for $40,000 ; that it did not contemplate a sale of any one portion of the aggregate property detached from the rest ; and that, therefore, the $999 which the plaintiff received when he assigned the lease, was simply part of an entire purchase price. It is the questions arising out of these propositions that are presented to us for consideration.

The contract signed by the plaintiff and Kinney is unilateral. The plaintiff agreed, conditionally, to do certain things ; but Kinney promised nothing. Whether the latter would accept the offer of the plaintiff was entirely optional with him. In the first paragraph of the instrument the plaintiff proposed to sell and deliver to Kinney a quantity of stock, a lease, and an interest in a tunnel site, provided Kinney would pay him $40,000 in certain specified installments, at certain times. Detached from the remainder of the contract, this amounted to an offer to sell the whole property for an entire price. But this proposal was followed by an agreement of the plaintiff that on payment of the $999, he would duly assign and turn over the lease to Kinney ; and the further agreement that the stock should then be deposited in bank, and upon each payment a proportionate amount delivered to Kinney,—a deed for an interest in the tunnel site to accompany the last delivery. In the same connection, the plaintiff also agreed, upon the third payment, to assign to Kinney an account against The Copper-Mountain Gold Mining Company for $1,250. The last section provided that the contract was to be regarded as an option given by the plaintiff to Kinney to purchase all the property at the price named ; that the terms of payment and delivery should be stated on the envelope containing the stock, as instructions to the bank in receiving payments and delivering the stock and deed ; and that in default of payments being made as specified, the stock and deed should be redelivered to the plaintiff. Now to arrive at the meaning which was intended to be conveyed by the language used, the whole contract must be read. While, segregated from the rest, the first section, and an expression in the last section, are, perhaps, not inconsistent with the construction for which plaintiff's counsel contend, yet they constitute only part of an entire instrument, and present in general language what is elsewhere particularized. Upon examining all the parts of the contract, we find that the proposition was to sell an enumerated list of articles for a certain sum

of money, payable in installments, a designated portion of
the articles to be delivered at the time of each payment.  It
is true that Mr. Kinney had an option to buy the whole
property for a definite sum to be paid in stated amounts at
stated times; and if none of the property was to be de-
livered until the entire consideration was paid, we should,
perhaps, be compelled to agree with counsel; but it was
part of the contract that at each payment he should receive
a specified portion of the property, and without special
agreement, its retransfer could not be compelled.  The op-
tion originally embraced all the articles.  It was at Mr.
Kinney's election whether he should take any of them, but
if he should avail himself of the privilege of taking part of
them, making the answering payments, the part taken would
be his; the amount of the property, subject to the option,
would be diminished at each payment by exactly the quantity
then delivered; and the right of election which originally
applied to the whole, would be confined to the residue.
Such would be our judgment as to the intention of the
parties from the general language used in providing for
payments and corresponding deliveries.  But it seems to us
that any doubt which might exist respecting such intention,
is set at rest in the concluding part of the instrument.
After providing for the indorsement upon the envelope con-
taining the stock and deed, of the terms of payment and
delivery, as an instruction to the bank, it further provided
that in default of the payments being made as specified in
the contract, the stock and deed should be redelivered to
the plaintiff.  There is nowhere in the contract, any pro-
vision for the return of the lease in case of default after the
first payment, or for the return of any other of the property
in case of default after the payment upon which it was de-
livered.  Counsel for the plaintiff, in discussing the last
paragraph of the contract, offer the following explanation
of the provision for the redelivery of the stock and deed, and
the omission of a provision for the retransfer of the lease:
" Counsel for the appellees lays great stress on the last

clause of this paragraph which provides for the redelivery of the stock and deed to said Hardwick, but fails to say anything about the lease. It will be observed that this is a direction to the bank and is a part of the escrow agreement to be indorsed on the envelope containing the stock and deed. The envelope did not contain either the account or the lease and the bank had nothing to do with them, so it is natural that no directions should be given it concerning them." Now if the parties could have foreseen, or if there had been a legal presumption, that McClurg, Kinney's assignee, after paying the first installment and receiving the lease, would make no further payment, the explanation might be satisfactory. The deed and all the stock would still remain in the possession of the bank, and there would be nothing in the way of their return to the plaintiff. But McClurg's refusal to proceed further, after receiving the lease, could not have been foreseen, and there was no legal presumption that he would decline any part of the option. Such being the case, let us see what becomes of the explanation. Mc-Clurg might make a number of the payments. There was no right to suppose that he would not make them all. The intention of the provision for the return of the stock and deed was simply to meet a possible failure somewhere along the line of payments. The deed was not to be delivered by the bank until the last payment, so that default anywhere would require the restoration of the deed. After the payment of the $4,000, following the $999, seven payments would remain. Let us suppose that Kinney, or his assignee, had made three of the $5,000 payments, and then stopped. At the time the contract was made there was no right to suppose that he would not do so, or that he would not do even more. But having so done, three sevenths of the stock would have passed out of the possession of the bank, and of that it could make no redelivery; and there was no provision for the return to the plaintiff of that stock. Moreover, at the third payment of $5,000,—the printed abstract has it $4,000, but this is a manifest mistake,—the plaintiff would

have assigned to the holder of the option an account against The Copper Mountain Gold Mining Company of $1,250, and there was no provision for the return of that account, or of the money realized upon it if it had been collected.

Here is where the explanation fails. It rests upon a supposition which neither counsel nor we have any right to entertain. From the fact that special provision was made in case of a stoppage of payments, for the return of all the property that the holder of the option had not taken, and that no provision was made for the return of anything else, we think it entirely clear that it was the intention of the parties that each delivery, in consideration of the payment then made, carried with it a title which the plaintiff could not question, and that the option survived only as to the residue.

A point is made on the provision for the payment by Kinney to the plaintiff of $1.00 cash in hand. The views of counsel upon the effect of that provision can, perhaps, be best understood by quoting their language: "The first payment of $1.00 was no doubt intended as the consideration for the option on the entire property. This being true, we will ask the court, if it can, to ascertain what price was put on the lease if it was intended to be sold separately as the appellees contend. Was it $999, $1,000, or should there be an apportionment of the $1.00 cash payment and say that one fortieth of it was to pay for the option on the lease and thirty-nine fortieths to pay for the option on the property? Is it not more reasonable to conclude that the $1.00 was intended as the consideration for the option on the entire property at the gross and entire price of $40,000, and that this price was divided into payments of $5,000 each to be made every ninety days, except the first, second and third payments, which constitute a like sum of $5,000? The reason for this, no doubt, was that Kinney did not want to make such a large payment on the option, while on the other hand Hardwick did not want to tie his property up ninety days for $1.00. Therefore the $1.00 was paid to bind the contract, the $999 was required

to be paid in ten days as good faith money, and $4,000, the balance of the first $5,000, was to be paid in ninety days."

It is evident from an inspection of the instrument, that the total payment upon which Kinney was entitled to a transfer of the lease, was $1,000, and that the $1.00 was simply an advancement upon that sum. Without doubt, as counsel say, "the $1.00 was paid to bind the contract." The advancement was a consideration for the option and disabled the plaintiff from revoking his offer before Kinney or his assignee should be in default. But the option for which it was the consideration, was the option proffered in the contract, and what that was, and what the rights of the parties in relation to it were, we have already considered. Counsel has referred us to some decisions holding contracts entire, of which there might be several partial performances. *State v. Scoggin*, 10 Ark. 326; *Weed v. Clogston*, 98 Mass. 147; *Wagon Co. v. Crocker*, 4 Fed. Rep. 577. None of the contracts passed upon in those cases were unilateral. The foundation of the liability of each defendant was his own covenant. If, in the case at bar, Kinney had covenanted with the plaintiff to make the several payments mentioned in the contract at the time specified, and the plaintiff, averring performance, or tender of performance, of his own agreements, had brought suit against Kinney to recover the installments in default, it would certainly be held that although the defendant had incurred successive liabilities, his contract was entire. The difference between a situation like that, and the one in hand, is obvious. Kinney bound himself by no contract. It is a misuse of terms to say that his contract was entire, for he entered into none. He was at liberty to make as many payments as he chose, and stop when he saw fit; but so long as he did pay, the plaintiff was bound to make the deliveries for which the payments called; when he ceased, the option, and the obligation of the plaintiff, were at an end; but the default could not affect rights which had previously attached.

If there was any parol agreement such as the complaint

alleges, we do not think it was admissible in evidence. The terms of a written instrument cannot be contradicted or varied by parol understandings or agreements. 1 Greenl. Ev. § 275. Where the terms employed are vague or ambiguous, attending circumstances, and the acts and declarations of the parties at the time, may be considered, not to add to, or detract from, the contract as it was written, but to find what meaning the parties intended to convey by the language they used. 1 Greenl. Ev. § 277; *McPhee v. Young,* 13 Colo. 80; *Lee v. Cravens,* 9 Colo. App. 272. There was no ambiguity in this written contract. It required no explanation. But even if the contract had needed the light which circumstances or declarations might have shed, the proof offered would not have supplied the want. It would have shown not the true meaning of the written contract, but a different and inconsistent contract.

We have proceeded to this point on the theory that there was some understanding between the parties to the contract, such as the complaint alleges, and have reached the conclusion that, conceding to the plaintiff his alleged facts, the judgment was right; but none of the evidence offered tended to prove that any understanding or agreement inconsistent with the terms of the written contract ever had an existence. The only allusion to a conversation relating to that contract found in the evidence is contained in the following excerpt from the testimony of the plaintiff:

" Q. After this paper was drawn up was there any conversation between yourself and Mr. Kinney and Mr. Montgomery as to the facts of what was conveyed by the option?

" A. Mr. Kinney dictated the option to Mr. Montgomery, and after it was typewritten Mr. Montgomery read the contract over to both of us, and I asked Mr. Montgomery after he read it over what was the tenor of that option or contract; he said it means this—this is an option on a certain amount of stock for ten days, and if they pay $999 at the end of ten days, then they can run ninety days longer, and then the

$4,000 becomes due, and if the $4,000 is not paid at that time the option is null and void."

It will be observed that this bears no resemblance to the supposed understanding which has been the subject of discussion. The statement of Mr. Montgomery accords with our own views as they have been expressed in this opinion. The payment of $999 would continue the option ninety days longer; and failure to pay the $4,000 at the end of that time would terminate it. But the option which would be continued, and the option that would be terminated, was the option defined in the written contract, and no other.

Let the judgment be affirmed.

*Affirmed.*